UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
**CENTRAL DIVISION AT LEXINGTON**

| | | |
|---|---|---|
| GARY FOLLOWELL, | ) | |
| | ) | |
| Plaintiff, | ) | Action No. 5:15-CV-00321-JMH |
| | ) | |
| v. | ) | |
| | ) | **MEMORANDUM OPINION AND ORDER** |
| NANCY J. BERRYHILL, | ) | |
| Acting Commissioner of | ) | |
| Social Security | ) | |
| | ) | |
| Defendant. | ) | |

** ** ** ** **

This matter is before the Court on the parties' cross-Motions for Summary Judgment (DE 10, 11) on Plaintiff's appeal of the Commissioner's denial of his application for disability insurance benefits.[1]  The matter having been fully briefed by the parties is now ripe for this Court's review.

**I.**

In determining whether an individual is disabled, an Administrative Law Judge ("ALJ") uses a five step analysis:

1. An individual who is working and engaging in substantial gainful activity is not disabled, regardless of the claimant's medical condition.

2. An individual who is working but does not have a "severe" impairment which significantly limits his physical or mental ability to do basic work activities is not disabled.

---

[1]   These are not traditional Rule 56 motions for summary judgment. Rather, it is a procedural device by which the parties bring the administrative record before the Court.

3. If an individual is not working and has a severe impairment which "meets the duration requirement and is listed in appendix 1 or equal to a listed impairment(s)", then he is disabled regardless of other factors.

4. If a decision cannot be reached based on current work activity and medical facts alone, and the claimant has a severe impairment, then the Secretary reviews the claimant's residual functional capacity and the physical and mental demands of the claimant's previous work. If the claimant is able to continue to do this previous work, then he is not disabled.

5. If the claimant cannot do any work he did in the past because of a severe impairment, then the Secretary considers his residual functional capacity, age, education, and past work experience to see if he can do other work. If he cannot, the claimant is disabled.

*Preslar v. Sec'y of Health & Hum. Servs.*, 14 F.3d 1107, 1110 (6th Cir. 1994)(citing 20 C.F.R. § 404.1520(1982)).

## II.

In October 2012, Plaintiff protectively applied for disability insurance benefits pursuant to Title II of the Social Security Act (Tr. 172-73). *See* 42 U.S.C. §§ 401-33.1 Plaintiff pursued his claim to a de novo hearing before an administrative law judge (ALJ) (Tr. 117-20, 122-24, 129-30), which the ALJ convened in February 2014 (Tr. 42-97). On April 30, 2014, the ALJ issued an unfavorable decision (Tr. 25-38). Plaintiff requested review of the ALJ's decision (Tr. 24, 241-45), which the Appeals

Council denied (Tr. 1-6), making the ALJ's decision the Commissioner's final decision for purposes of judicial review. *See* 20 C.F.R. § 422.210(a).

### III.

Plaintiff was an individual closely approaching advanced age on the date of the ALJ's decision (Tr. 52, 172). He has a twelfth grade education (Tr. 52, 216) and past work experience as a material handler, color plate handler, and band saw operator (Tr. 92-93, 178-87, 191-99, 216). He alleged disability since April 30, 2012 (Tr. 172) due to arthritis and hypertension (Tr. 214-15, 225-26, 230).

In May 2012, Plaintiff presented to Donald Hamner, M.D., with complaints that included bilateral knee pain and pain with walking (Tr. 253-54). Dr. Hamner diagnosed degenerative arthritis of his knees and hypertension under adequate control (Tr. 255). In January 2013, Alex Guerrero, M.D., a state agency psychiatrist, reviewed the evidence and said Plaintiff did not have a severe mental impairment (Tr. 108-16).

In February 2013, Carlos Hernandez, M.D., a state agency physician, reviewed the evidence and assessed limitations consistent with medium work (Tr. 108-16). Two days later, Plaintiff presented to Jeremy Tarter, M.D., with complaints that he continued to struggle with both of his knees with increased debilitation and compromised activities of daily living (Tr. 306). X-rays showed

3

that he had end stage medial compartment degenerative changes and surprisingly quite a bit of patellofemoral degenerative changes with osteophytes (bone spurs) and loss of clear space (Tr. 306). Plaintiff underwent bilateral total knee replacement surgery on April 8, 2013 and was discharged three days later with prescriptions for narcotic medications (Tr. 258-70).

On April 15, 2013, Plaintiff told Lindsey Martin, PT, that she had no significant complaints of pain, but tightness (Tr. 288). Ms. Martin noted that Plaintiff tolerated initiation of therapy exercises well (Tr. 288). Three days later, Plaintiff told Ms. Martin that he felt "pretty good" and had no significant complaints of pain, but muscle soreness (Tr. 287).[2] Ms. Martin found that Plaintiff was doing remarkably better with much improved leg strength and endurance since his prior visit (Tr. 287). The following day, Ms. Martin noted that Plaintiff continued to tolerate therapy exercises well (Tr. 286).

On April 23, 2013, Plaintiff told Ms. Martin that he ambulated some at home using a cane with his right hand (Tr. 285). Ms. Martin found that Plaintiff tolerated therapy exercises (Tr. 285). She said he required a cane for ambulating, but did very well (Tr. 285). On April 24, 2013, Plaintiff told Ms. Martin that he was doing well and had a "big day" the prior day and did a lot of

---

[2] Plaintiff made the same or similar statements later that month (Tr. 283-86) and again in May 2013 (Tr. 281-82).

walking, which made him sore (Tr. 284). Ms. Martin noted that he was very adamant about performing his home exercise program and stretches, which "[was] reflected in his progress" (Tr. 284). Five days later, Plaintiff reported that he had been very active over the weekend and was "out walking quite a lot" (Tr. 283). Ms. Martin noted that he continued to do very well with treatment, tolerated increased therapy exercises, and ambulated with a cane, although he was homebound and stayed by himself during the day (Tr. 283).

On May 1, 2013, Ms. Martin noted that Plaintiff tolerated increased therapy exercises and demonstrated good balance and side stepping (Tr. 282). The following day, he returned to Dr. Tarter, reporting that he was doing well in all regards, had one more week of home therapy, and used a cane outside of his house (Tr. 304). Dr. Tarter found that both of his knees looked great, although he lacked a little bit of extension on the left, and had a functional gait (Tr. 304). Dr. Tarter said Plaintiff was "way ahead of the game functionally," a product of his diligence, and that it was fine if he stopped physical therapy (Tr. 304). He refilled Plaintiff's Lortab and Ultram (narcotics) (Tr. 304).

On May 3, 2013, Plaintiff told Ms. Martin that he was very pleased with his progress and was no longer taking prescription pain medications (Tr. 281). Ms. Martin said that he continued to do exceptionally well, tolerated initiation of therapy exercises, and ambulated in his home with an assistive device (Tr. 281). Three

5

days later, Plaintiff told Ms. Martin that he felt okay, but was "under the weather" and had inner ear problems, which affected his balance and required him to use a cane (Tr. 280). Ms. Martin noted that Plaintiff tolerated exercises using weight as resistance (Tr. 280).

On May 7, 2013, Plaintiff told Ms. Martin that he was doing "pretty fair," but still struggling with some inner ear issues (Tr. 279). Ms. Martin noted that Plaintiff performed very well, tolerating increased repetitions in all exercises and exhibiting little to no limp ambulating with an assistive device (Tr. 279). Two days later, Ms. Martin discharged Plaintiff from physical therapy, noting he met all of his goals and progressed exceptionally well (Tr. 278).

In June 2013, Plaintiff returned to Dr. Tarter, reporting a little bit of discomfort in his knees and that he was improving steadily overall (Tr. 303). He said he had spasms at night (Tr. 303). Plaintiff said he was actually very active, having mowed, worked on part of his farm, and used his weed eater the prior day and walked about three to four miles per day in the course of his normal life (Tr. 303). Dr. Tarter again found that his knees looked good and he continued to do quite well (Tr. 303). Plaintiff said he wanted to ride a bike (Tr. 303).

The following August, Plaintiff complained to Dr. Hamner of depression and pain in his knees and elbow (Tr. 299). Dr. Hamner

6

found that Plaintiff had pain in his right knee with stairs, although he was okay on level ground (Tr. 300). He diagnosed osteoarthritis, depression, and knee pain and prescribed medications, including Celexa (an antidepressant) (Tr. 300).

In September 2013, Plaintiff told Dr. Tarter that he was doing very well and he had a little discomfort in his knees (Tr. 302). Dr. Tarter found that Plaintiff did not have any effusion in either knee (Tr. 302). He had excellent flexion, no laxity, and normal motor functioning, although he had diminished sensation (Tr. 302). Plaintiff complained of bilateral shoulder and thumb pain and right elbow arthritis (Tr. 302). Dr. Tarter said Plaintiff's knee function should improve (Tr. 302). He said that Plaintiff was previously a manual laborer and did not think that he could return to this position in any capacity no matter how well his knees recovered (Tr. 302). He also said Plaintiff applied for disability, which he thought this was reasonable given his conglomeration of musculoskeletal difficulties, and prescribed Ultram (Tr. 302).

In January 2014, Plaintiff returned to Dr. Hamner with complaints of pain in his right elbow, left thumb, and knees (Tr. 309). Dr. Hamner found that he had right elbow tenderness and pain in the base of the left thumb and adjusted his medications (Tr. 309). Dr. Hamner said Plaintiff's prognosis for returning to active employment was poor (Tr. 312). He said Plaintiff's pain was sufficiently severe to interfere with his attention and

7

concentration frequently (Tr. 314). He said Plaintiff had a marked limitation on his ability to deal with normal stresses of competitive employment such as working at a constant pace, working appropriately with coworkers and supervisors, and not taking an excessive number of breaks (Tr. 314). He said Plaintiff could only sit and stand for 30 minutes each at one time and walk for 20 minutes at one time and sit, stand, and walk for less than two hours each in an eight-hour workday (Tr. 315). He said that, in an eight-hour workday, Plaintiff needed frequent periods of walking; to lie down at will; to shift positions at will from sitting, standing, or walking; to elevate his right leg at will; and to use a cane while standing and walking (Tr. 316). He said Plaintiff could frequently lift less than 10 pounds and infrequently lift 20 pounds (Tr. 316). He said Plaintiff could not use his right hand for grasping, turning or twisting or either hand for reaching (Tr. 317). He said Plaintiff could not work at a regular job on a sustained basis (i.e., eight hours per day, five days per week, forty hours per week) (Tr. 317). He said Plaintiff had a reasonable medical need to be absent from a full time work schedule on a chronic basis, meaning more than two absences per month (Tr. 317), and would miss work 70 percent of the time (Tr. 318).

In October 2012, Plaintiff said he took care of pets, including dogs and chickens (Tr. 207). He said he had no problem with his personal care (Tr. 207); prepared his own meals, including

sandwiches, once or twice a week; mowed the grass once a week on
a riding lawnmower for two hours (Tr. 208); went outside two or
three times per day; drove a car (Tr. 209); read and watched
television on a daily basis; and spent time with others once or
twice per week (Tr. 210). At the administrative hearing, he said
that he could drive a car (Tr. 53). He said that, on a typical
day, he sat around and watched old movies on television (Tr. 68-
69, 73). He said he could care for his personal needs, although he
needed his wife to help him with buttons and shoes (Tr. 69). He
said he used his phone to look at hunting web sites twice a week
for five minutes at a time (Tr. 75). He said he went to Gatlinburg,
Tennessee, in August 2013 for a one-week vacation where his wife
drove for about five hours with three stops of 15 to 20 minutes
each (Tr. 70-72). He said he drove to take his garbage to the
landfill twice a week (Tr. 72). He said he occasionally vacuumed
(Tr. 76). He said he could carry 30 pounds, but only with his left
hand (Tr. 77), and could only sit for 10 to 15 minutes without
standing (Tr. 79). He said his hand pain limited his ability to
work the most (Tr. 58-61, 64-65, 73). He said he had no grip
strength and could not hold anything (Tr. 58). He said he could
not bend his thumbs to the bases of his hands (Tr. 59-60). He rated
this pain as a seven or eight on a 10-point scale once or twice a
week for one to two days with heat and Tramadol reducing it to a
four (Tr. 60-61). He said he started using a cane after his surgery

(Tr. 61-62), which eased is knee pain, but he still had muscle weakness on the right and sometimes fell (Tr. 63). He said he had fallen three times since his surgery (Tr. 88). He said he had right elbow pain for 10 years (Tr. 61). He said he was depressed (Tr. 65), which got worse by sitting in the house, but improved on "pretty days" and with medications (Tr. 66). He said he could only be around 10 people (Tr. 65).

The ALJ asked William Harpool, a vocational expert, to assume a hypothetical individual of Plaintiff's age, education and work experience who could

> perform a limited range of light exertional work. That is to say, no lifting or carrying more than 20 pounds occasionally, 10 pounds frequently. No standing or walking for more than six hours out of an eight-hour day and for no more than 30 minutes at one time. No sitting for more than six hours out of an eight-hour day and for no more than an hour at a time. Can do unlimited pushing or pulling up to the exertional limitations. No more than occasional balancing, stooping, or climbing of ramps or stairs, but no kneeling, crouching, crawling or climbing of ladders, ropes or scaffolds. Such a person must use a cane for walking on level surfaces but not for balance. No work in areas of concentrated full body vibration or using vibrating tools. No work in areas of concentrated heat, cold or humidity, wetness or dampness. No more than frequent fine fingering or gross manipulation, bilaterally. No more than simple, routine work. No more than occasional interaction with co-workers, supervisors or the general public and no more than occasional changes in the work place setting.

10

(Tr. 93-94). Mr. Harpool said that, while such a person could not perform his past work, he could perform the jobs of final inspector; automatic machine operator; and night watchman (Tr. 94).

The ALJ followed the five-step sequential evaluation set forth in the agency's regulations for determining disability. *See* 20 C.F.R. § 404.1520(a)(4). As relevant here, at step three, the ALJ found that Plaintiff did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments in 20 C.F.R. pt. 404, subpt. P, app. 1 (the Listings) (Tr. 31-33). The ALJ found that Plaintiff had the residual functional capacity for a range of light work with limitations as set forth in his hypothetical question to the vocational expert, discussed above (Tr. 33-36). Proceeding to step five, the ALJ found that Plaintiff was not disabled because he could perform other work existing in significant numbers in the national economy, including the jobs cited by the vocational expert (Tr. 37-38).

## IV.

When reviewing a decision made by the ALJ, the Court may not "'try the case *de novo*, resolve conflicts in evidence, or decide questions of credibility.'" *Ulman v. Comm'r of Soc. Sec.*, 693 F.3d 709, 713 (6th Cir. 2012) (quoting *Bass v. McMahon*, 499 F.3d 506, 509 (6th Cir. 2007). "The ALJ's findings are conclusive as long

as they are supported by substantial evidence." 42 U.S.C. § 405(g); *Foster v. Halter*, 279 F.3d 348, 353 (6th Cir. 2001) (citations omitted). Substantial evidence "means such relevant evidence as a reasonable mind might accept." *Foster*, 279 F.3d at 353.

**V.**

As an initial matter, Plaintiff argues that the ALJ erred because he did not find that Plaintiff had an impairment or combination of impairments that met Listing § 1.02A (Pl.'s Br. at 2, 7-9). The agency's regulations provide that a claimant is per se disabled at step three of the sequential evaluation process if he has an impairment or combination of impairments that meets or medically equals all of the requirements of a Listing. *See* 20 C.F.R. § 404.1525; 20 C.F.R. pt. 404, subpt. P, app. 1. It is the claimant's burden to prove disability at this step. *See Bowen v. Yuckert*, 482 U.S. 137, 146 n. 5 (1987); *Her v. Comm'r of Soc. Sec.*, 203 F.3d 388, 391 (6th Cir. 1999) ("the burden of proof lies with the claimant at steps one through four of the [sequential evaluation process].").

Listing § 1.02 provides for per se disability in relevant part as follows:

> 1.02 *Major dysfunction of a joint(s) due to any cause):* Characterized by gross anatomical deformity (e.g., subluxation, contracture, bony or fibrous ankylosis, instability) and chronic joint pain and stiffness with signs of limitation of motion or other abnormal motion of the affected joint(s), and findings on

12

>    appropriate medically acceptable imaging of
>    joint space narrowing, bony destruction, or
>    ankylosis of the affected joint(s). With:
>
>    A. Involvement of one major peripheral weight-
>    bearing joint (*i.e.*, hip, knee, or ankle),
>    resulting in inability to ambulate
>    effectively, as defined in 1.00B2b; . . . .

20 C.F.R. pt. 404, subpt. P, app. 1, § 1.02A.  "Inability to ambulate effectively means an extreme limitation on the ability to walk; . . . . [and] is defined generally as having insufficient lower extremity functioning . . . to permit independent ambulation without the use of a hand-held assistive device(s) that limits the functioning of both upper extremities." 20 C.F.R. pt. 404, subpt. P, app. 1, § 1.00B2b(1).

"[F]or a claimant to show that his impairment matches a Listing, it must meet *all* of the specified criteria. An impairment that manifests only some of those criteria, no matter how severely, does not qualify." *Sullivan v. Zebley*, 493 U.S. 521, 530 (1990) (emphasis in original).  The Court is not persuaded that Plaintiff has shown that his impairment meets all of the specified criteria for Listing § 1.02(A) and determines that the ALJ's conclusion that Plaintiff did not have an impairment or combination of impairments that met or medically equaled Listing § 1.02, inclusive of subparagraphs A and B (Tr. 31-33)  is supported by substantial evidence.

Plaintiff relies on his testimony that he must use a rail and a cane or two canes to climb stairs (Tr. 81); that his orthopedic surgeon, Dr. Tarter, documented Plaintiff's persistent pain and instability five (5) months after his bilateral knee replacements. (R. 302); and that Dr. Hamner, his primary care physician, noted in January 2014 that that Plaintiff suffered from poor sleep due to joint discomfort and continued to have pain in both knees despite surgery (R. 308-309); and that Dr. Hamner opined that Plaintiff required the use of a cane or other assistive device for standing and walking and that his use of the cane demonstrated the great pain which Plaintiff was experiencing. (R. 313-16).

Even so, this evidence does not demonstrate an "extreme limitation on the ability to walk" in light of all of the evidence in the record. Evidence in the record tracks an impressive recovery from knee surgery, which hardly suggests the type of chronic pain or stiffness in his knees that would yield an extreme limitation on his ability to walk – even when his need to use a rail and his cane on stairs is considered. *See* (Tr. 258-70, 288 (explaining to physical therapist, one week after bilateral knee surgery in August 2013 that he had no significant complaints of pain); Tr. 283-87 (same one month later); Tr. 281-82 (same in May 2013); Tr. 304 (orthopedic surgeon noted on May 2, 2013, that both of Plaintiff's knees looked great and that he lacked only a little bit of extension on the left ); Tr. 303 (orthopedic surgeon noting

14

in June 2013, that Plaintiff had only a little bit of discomfort
in his knees and that he was improving steadily overall; Tr. 300
(general practitioner observed in August 2013 that Plaintiff had
pain in his right knee with stairs, but was okay on level ground;
Tr. 302 (Plaintiff reported to orthopedic surgeon in September
2013 that he was doing very well and had only a little discomfort
in his knees; surgeon found no effusion in either knee and observed
excellent flexion, no laxity, and normal motor functioning)).

Further, the ALJ relied on evidence in the record that
Plaintiff was quite active both before and after surgery, taking
care of himself and his farm in determining the level of
restriction applicable in daily living when deciding that
Plaintiff did not meet Listing 12.04 due to mental impairment. In
this instance, the same body of evidence supports the conclusion
that Plaintiff does not qualify under Listing 1.02(A) because it
reveals an active, ambulatory lifestyle, notwithstanding the
condition of Plaintiff's knee pre-operatively or post-operatively.
*See*, *e.g.,* (Tr. 207 (prior to surgery and in October 2012,
Plaintiff reported that he took care of pets, including dogs and
chickens and was engaged in personal care, including preparing his
own meals from time to time, mowing the lawn on a riding lawnmower,
going outside and driving a car); *see also* Tr. 285 (on April 23,
2013, several weeks after his surgery, physical therapist noted
that Plaintiff ambulated at home using a single cane with his right

hand which he required); Tr. 284 (Plaintiff told physical therapist
that he was doing well and had a "big day" the prior day and did
a lot of walking); Tr. 283 (in late April 2013, Plaintiff reported
to physical therapist that he had been very active over the weekend
and was "out walking quite a lot"); Tr. 282 (physical therapist
noted good balance and side stepping on May 1, 2013); Tr. 304
(orthopedic surgeon noted on May 2, 2013, that Plaintiff used a
cane outside of his house and had a functional gait), Tr. 281
(physical therapist noted on May 3, 2013, that Plaintiff ambulated
in his home with an assistive device); Tr. 280 (physical therapist
noted on May 6, 2013, that Plaintiff had to use a cane); Tr. 279
(physical therapist notes that Plaintiff exhibited little to no
limp when Plaintiff ambulated with an assistive device on May 7,
2013); Tr. 303 (Plaintiff reports mowing, working on part of his
farm, using his weed eater, and walking three to four miles in the
course of daily life in June 2013); Tr. 53 (testifying that he
could drive a car; Tr. 69 (testifying that he could care for his
personal needs; Tr. 70-72 (testifying that he went to Gatlinburg,
Tennessee, in August 2013 for a one-week vacation where his wife
drove for about five hours with three stops of 15 to 20 minutes
each); Tr. 72 (testifying that he drove to take his garbage to the
landfill twice a week); Tr. 76 (testifying that he occasionally
vacuumed)).  The ALJ's decision that Plaintiff did not have an
impairment or combination of impairments that met or medically

equaled the severity of Listing 1.02(A) is supported by substantial evidence of record.

Next, Plaintiff argues that the ALJ erred by not reasonably considering the opinion of Dr. Hamner that Plaintiff's prognosis for returning to active employment was poor (Tr. 312) in determining his residual functional capacity (Pl.'s Br. at 2, 9-13). Residual functional capacity "is an administrative assessment of the extent to which an individual's medically determinable impairment(s), including any related symptoms, such as pain, may cause physical or mental limitations that may affect his or her ability to do work related physical or mental activities." Social Security Ruling (SSR) 96-8p, 1996 WL 374184, at *2. It is the most a person can do, despite his limitations. *See id.* The ALJ bears the responsibility for assessing a claimant's residual functional capacity. *See* 20 C.F.R. §§ 404.1545, 404.1546(c); *Warner v. Comm'r of Soc. Sec.*, 375 F.3d 387, 390 (6th Cir. 2004) ("The determination of disability is ultimately the prerogative of the Commissioner, not the treating physician." (quotation and brackets omitted)).

The ALJ must decide what weight, if any, to give to the medical opinions of record. "Medical opinions" are defined as "statements from physicians and psychologists or other acceptable medical sources that reflect judgments about the nature and severity of your impairment(s), including your symptoms, diagnosis, and prognosis, what you can still do despite

17

impairment(s), and your physical and mental restrictions." 20 C.F.R. § 404.1527(a)(2). Some "medical opinions" are entitled to "controlling weight." *See id.* § 404.1527(c)(2). To be eligible for controlling weight, the opinion must be a medical opinion and must also (1) come from a treating source, i.e., an acceptable medical source "who provides you, or has provided you with medical treatment or evaluation and who has, or has had, an ongoing treatment relationship with you," *id.* § 404.1502; (2) be "well-supported by medically acceptable clinical and laboratory diagnostic techniques"; and (3) be "not inconsistent" with the other substantial evidence in the case record. SSR 96-2p, 1996 WL 374188, at *2. If no opinion is entitled to controlling weight, the agency considers several factors in deciding how much weight to give to an opinion, including the nature of the medical source's relationship with the claimant, supportability, consistency, specialization, and any other factors that tend to support or contradict the opinion. *See* 20 C.F.R. §§ 404.1527(c)(1)-(6). Generally, an ALJ should give the opinions of a treating physician controlling weight, but may discount the opinion if he provides good reasons supported by substantial evidence. *See Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004).

When Dr. Hamner opined that Plaintiff prognosis for returning to active employment was poor (Tr. 312), he was not offering a medical opinion but was offering an opinion on an administrative

18

finding reserved to the Commissioner (Tr. 36). *See* 20 C.F.R. § 404.1527(d)(1)-(3) (stating that opinions on some issues, including whether a claimant is "disabled" or "unable to work" are not medical opinions, but opinions reserved to the Commissioner because they are administrative findings that are dispositive of a case, i.e., that would direct the determination or decision of disability); *Bass v. McMahon*, 499 F.3d 506, 511-12 (6th Cir. 2007) (the ALJ properly rejected a treating physician's "conclusion of disabling back pain," where "controlling weight will not be provided to a treating physician's opinion on an issue reserved to the Commissioner, and where this opinion was inconsistent with the treating physician's own statements on other occasions and with the opinions of other evaluators).

The ALJ observed that Dr. Hamner's concerns about Plaintiff's potential to return to work ignored the positive results that Plaintiff experienced following his knee surgery (Tr. 36, 278-79, 281-88, 302-04). An ALJ can discount the opinion of a treating source where it is inconsistent with the record as a whole. *See* 20 C.F.R. § 404.1527(c)(4) (stating an ALJ must consider whether an opinion is consistent with the record as a whole); *Norris v. Comm'r of Soc. Sec.*, 461 F. App'x 433, 439 (6th Cir. 2012) (unpublished) ("Any record opinion, even that of a treating source, may be rejected by the ALJ when the source's opinion is not well supported by medical diagnostics or is inconsistent with the record."). Thus,

the Court concludes that the ALJ reasonably assigned only "little weight" to the opinion of Dr. Hamner (Tr. 36) and articulated good reasons, supported by substantial evidence, for doing so. Ultimately, the ALJ assigned an RFC far more limited than proposed state agency medical consultant Carlos X. Hernandez, M.D., who opined that Plaintiff could perform a limited range of medium exertional work. (*Id*.) The ALJ felt that Plaintiff needed an even more restrictive RFC which provided for changing positions more frequently (which, interestingly enough, tracks Dr. Hamner's suggestion that Plaintiff would need to change positions every half hour or so, although it does not adopt his opinion that Plaintiff could not sit, stand, or walk for more than two hours in an eight hour workday), and, thus, crafted an RFC which included that, as well, for a limited range of light work. (*Id*. at 33, 36.) This is both legally appropriate, considering the errand reserved to the ALJ, and supported by substantial evidence of record based on the observations and opinions of the various positions, assigned weight based on their opinions support in the record, and Plaintiff's own testimony. This is not error, as Plaintiff suggests, and the decision of the ALJ and, thus, the Acting Commissioner will be affirmed.

Accordingly, for all of the reasons set forth above, **IT IS ORDERED**:

    1)    that Plaintiff's Motion for Summary Judgment (DE 10) is **DENIED;** and

    2)    that Defendant's Motion for Summary Judgment (DE 11) is **GRANTED.**

This the 31st day of March, 2017.

**Signed By:**

_**Joseph M. Hood**_

**Senior U.S. District Judge**

21